**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

ANDREW JOSEPH, JR., as
natural father, next friend and
personal representative of the
Estate of Andrew Joseph, III, deceased,

                                            CASE NO: 8:16-cv-274-T-35TBM

                Plaintiff,

vs.

DAVID GEE, in his official capacity as
the Sheriff of Hillsborough County, State of Florida;
THE FLORIDA STATE FAIR AUTHORITY, an
instrumentality of the State of Florida; the
HILLSBOROUGH COUNTY SCHOOL BOARD,

                Defendants,
_____ /

## AMENDED COMPLAINT

Plaintiff, ANDREW JOSEPH, JR., as the natural father, next friend and personal representative of the Estate of Andrew Joseph, III, by and through his undersigned counsel, hereby sues Defendants, DAVID GEE, in his official capacity as the Sheriff of Hillsborough County, Florida; THE FLORIDA STATE FAIR AUTHORITY, an instrumentality of the State of Florida; and the HILLSBOROUGH COUNTY SCHOOL BOARD, and states:

## JURISDICTION & VENUE

1.     This is an action for damages in excess of $15,000 and for costs and attorneys' fees arising under section 1983 of Title 42 of the United States Code based upon violations and deprivations of rights arising under the 4th, and 14th Amendments of the United States Constitution, together

1

with claims brought under the laws of the State of Florida, for the targeting and unjustified detention and de facto arrest of a nonviolent and non-resistant juvenile, and the subsequent forced eviction of the juvenile from an event known as 'Student Day' taking place at a portion of the Florida State Fairgrounds.   Said juvenile was targeted and illegally detained; subjected to a de facto arrest; and then forcibly taken to a different area of Fairgrounds than that to which he had been dropped off and different from which he was expected to be picked up for the purposes of his eviction from the event.  All of these actions took place without notification to his parents and without any oversight or attention to his welfare and well-being after being evicted from a Fairgrounds gate in close proximity to an area of heavy interstate traffic, forcing the juvenile to attempt to cross the travel lanes of I-4 in order to return to the area where he had been dropped off and at which he was supposed to be picked up.  As he crossed the interstate, the juvenile was hit and killed by an oncoming vehicle.  Plaintiff alleges that the actions of the Defendants and the conduct relating to these events constitutes conduct that shocks the conscience and is offensive to the community's sense of decency and fair play.  These events occurred on or about February 7, 2014 in Hillsborough County, Florida.

2.      This civil rights causes of action are brought pursuant to 42 U.S.C. §1983, for violations of the Fourth, and Fourteenth Amendments to the United States Constitution, which protect Americans from unlawful seizures and from the use of excessive or unreasonable force by law enforcement, cruel and unusual punishment, and loss of life or liberty without due process of law, respectively.  This Court has jurisdiction to hear § 1983 cases and has ancillary jurisdiction to hear pendant state Wrongful Death Act claims under Florida Statutes 768.16 – 768.28, as the claims arise from a common nucleus of operative fact.

3.      Venue is proper in this Court because at all times the actions, policies, customs, practices, and conduct herein alleged were performed and implemented in Hillsborough County, Florida by the Defendants and their employees under the course and scope of their employment and under color of state and local law.

4.      All conditions precedent including those set forth in §768.28(6) (a), Fla. Stat. (2007), have been performed or satisfied, have occurred, have been waived, or would be futile.

5.      Jury trial is hereby demanded as to all Counts and issues so triable.

**PARTIES & INTERESTED PERSONS**

6.      Andrew Joseph, III. ("Andrew"), deceased, was at all time material hereto, a 14-year old honor student attending private school in Hillsborough County, Florida.   Andrew was an honor student with no criminal record whatsoever.  He bore no tattoos and was not associated with any gang or other criminally-associated group and was in all respects a model citizen and an honor student.  Andrew was killed on February 7, 2014 after having been a patron at the Florida State Fairgrounds on "Student Day."   At all times, Andrew was a citizen of the United States of America entitled to any and all rights, privileges, protections, and immunities secured by the Constitution and the laws of this Country.

7.      Plaintiff, ANDREW JOSEPH, JR., ("Mr. Joseph") is the natural father of Andrew and is the Personal Representative of the Estate of Andrew Joseph, III.  Mr. Joseph is a resident of Hillsborough County, Florida and a citizen of the United States of America entitled to any and all rights, privileges, protections, and immunities secured by the Constitution and the laws of this Country.

8.     Defendant, DAVID GEE ("Gee"), is and was at all times material hereto the Sheriff of Hillsborough County, serving in his official capacity as such, and acting under the color of state law. Gee is the director of and presides over the Hillsborough County Sherriff's Office ("HCSO"). HCSO is the law enforcement agency for Hillsborough County.   Gee and HCSO are used interchangeably in this complaint for Gee.  At all times material, Gee, acting in his official capacity as Sheriff of Hillsborough County, is a "person" for purposes of 42 U.S.C. §1983.

9.     Defendant, THE FLORIDA STATE FAIR AUTHORITY ("Fair") was at all times relevant to this Complaint, an instrumentality of the State of Florida organized and operating under the Florida Department of Agriculture.  The Fair is specifically authorized to sue and to be sued in its own capacity by virtue of Florida Statute Section 616.254.  Section 616.255(2), Fla. Stat., provides that the Fair shall "...promote the progress of the state and stimulate public interest in the advantages and development of the state by providing facilities for agricultural and industrial exhibitions, public gatherings, cultural activities, and other functions intended to advance the educational, physical, economic, and cultural interests of the public..."

10.     The Fair is the owner of approximately 355 acres in Hillsborough County ("the Fairgrounds") which is bounded on two sides by Interstate-4, which also intersects with Orient Road on the far West side of the property and a significant distance away from the primary area where most Fair activities, including Student Day, are held.  The east side of the Fairgrounds property is bordered by U. S. Highway 301, which provides the vast majority of vehicular access to the Fairgrounds.  The primary vehicle parking areas serving the Fairgrounds are all located adjacent to Hwy. 301 on the east side of the property.  An aerial photograph of the Fairgrounds depicting the layout is attached as Exhibit A.

11.     Defendant, HILLSBOROUGH COUNTY SCHOOL BOARD (the "School Board"), is a governmental entity, organized under the Laws of Florida, the governing body of the Hillsborough County School District and responsible for the control, operation, organization, management, and administration of public schools in Hillsborough County, Florida.

12.     Pursuant to the provision of the Florida Wrongful Death Act, the survivors of Andrew are his natural father, Andrew Joseph, Jr. and Mr. Joseph's wife, Deanna Hardy, who is the natural mother of Andrew, each of whom claim individually as survivors through Mr. Joseph, as the personal representative of Andrew's estate.

## GENERAL ALLEGATIONS APPLICABLE TO ALL COUNTS

### *"Student Day" at the Fairgrounds*

13.     For well over fifty (50) years, in conjunction with the Fair, students of Hillsborough County schools have been given a day off from school and provided with free admission to an event current known as "Student Day" at the Florida State Fairgrounds.

14.     Prior to Student Day, the School Board arranged for the distribution of over 100,000 free admission tickets to students attending school in Hillsborough County.   Tickets to the 2014 Student Day were provided to students by teachers or other employees or agents of the School Board prior to February 7, 2014.  The tickets were provided at Hillsborough County Schools during normal school hours and school employees or representatives encouraged students to attend.  The tickets were freely transferable among the students and the admission tickets were not assigned or issued to any particular student but were intended to provide Student Day admission to any Hillsborough County students.   A copy of a sample admission ticket is attached as Exhibit A.

15.     Security for Student Day at the Fairgrounds is provided by the HCSO and is administered by and at the discretion of deputies assigned to duty there.  On February 7, 2014, those deputies included both on-duty and off-duty deputies.

16.     Off-duty deputies providing security at the event were paid directly by the Fair or, alternatively, the Fair reimburses HCSO for the services of off-duty deputies providing security services at the Fair.

17.     Upon information and belief, the Student Day event is one that is extremely profitable for both the Fair and the School District, generating well over $1 million dollars in revenue each and every year.

### *HCSO at the Fair*

18.     The provision of deputies by HCSO at the Fair, and particularly at Student Day events, is an undertaking that the HCSO has assumed for a number of years prior to 2014.  As the result of its past experiences at Student Day, HCSO was aware that it would likely encounter large numbers of students of students and juveniles and that increased staffing would be required in order to handle security duties.

19.     HCSO was also aware based on the large numbers of juveniles expected to attend, that specific definitions and standards of conduct needed to be established so that deputies and other security personnel at Student Day would know what conduct was prohibited; what conduct was permissible; what objective standards would be employed by deputies to determine who would be subject to detention; who would be subject to ejectment; who would be subject to trespass; who would be subject to arrest; and that some system of supervisory oversight or some system of checks and balances over officer's discretionary actions needed to be established for the purposes of

Student Day to prevent excessive arrests, detentions, ejectments and trespasses and to prevent the unconstitutional application of those actions by those providing security at Student Day.

20.    HCSO was further aware and on notice due to the large numbers of juveniles expected to attend and due to its past experiences in previous years' Student Day events, that specific, uniform procedures needed to be established for the 2014 Student Day for the deputies to employ in the process of conducting arrests, detentions, ejectments and trespasses of juveniles and to prevent the unconstitutional application of those actions by those providing security at Student Day.  Part of the procedures that needed to be established was a uniform procedure for the processing of juveniles with whom deputies or security personnel detained, arrested, ejected or trespassed with respect to them being processed into system:   where they would be taken;  who would be responsible for them; what would take place at the Fair while in the custody and control of deputies or security prior to their release or transport away from the Fairgrounds; what reports or paperwork would be generated regarding each juvenile; and what supervisory oversight would be in place to ensure that the processing of these juveniles was properly and uniformly handled by deputies and security personnel.

21.    Perhaps most importantly, HCSO was further aware and on notice due to the large numbers of juveniles expected to attend and due to its past experiences in previous years' Student Day events, that not only did specific, uniform procedures need to be established for the 2014 Student Day for the deputies to employ in the process of conducting arrests, detentions, ejectments and trespasses of juveniles; HCSO needed to establish specific mandatory procedures governing the procedures for the release of juveniles who would be ejected, evicted or trespassed from the Fair.

22.    HCSO knew or should have known based on its past experiences in previous years' Student Day events, that the vast majority of students would enter the Fairgrounds for Student Day at the

Gate or Gates located adjacent to the vehicle parking lots on the US 301 east side of the Fairgrounds and that those Gates were the ones most accessible, convenient and safest points of ingress and egress to and from Student Day.

23.     HCSO also knew or should have known that the Gate at the approximate westernmost border of the Fairgrounds, believed to have been known as Gate 4 which is marked as such on Exhibit A, was the Gate in the close proximity to the heavily-trafficked Interstate-4 and was the Gate that was at the furthest possible distance and location from the Gates adjacent to the vehicle parking lots and US Hwy 301 access, where the vast majority of students would enter the Fair. Additionally, because of fencing and other barriers on and around the Fairgrounds, there was no clear path or area that could be safely traversed on foot from outside Gate 4 back to the US Hwy 301 side.  The only direct route, as well as the safest route to return to the parking lots and adjacent entrance Gates from outside Gate 4 was to return into the Fair through Gate 4 and walk east back through the Fair itself.

24.     At all times material, HCSO knew or should have known, that specifically for those juveniles who were being forcibly ejected from the Fair but who were not being formally arrested, HCSO needed to have in place during the 2014 Student Day events, definitive, uniform procedures governing the following:

   a)   What specific conduct would constitute "unruly" behavior or "misbehaving" that would warrant the stop or detention of students during the Student Day events;

   b)   What specific conduct warranted the ejectment, eviction or trespassing of juveniles from the Fair;

   c)   Where these juveniles would be initially taken and processed for ejectment, eviction or trespass inside the Fair;

8

d)   A uniform location or release point where these juveniles would be taken to be ejected off the Fair property away from the Student Day events;

e)   A uniform procedure governing how and by whom these juveniles would be transported or taken from the processing area inside the Fair to the release or ejection location to have them placed outside the event;

f)   Ensuring that the release or ejection point for these juveniles was chosen with proper consideration for the safety and security of those students after they had been ejected from the event and that these student were not simply deposited outside the event without some type of instruction or supervision covering how they were to return home or how they were to return to the parking or drop off area where they were supposed to meet their families or rendezvous with their transportation away from the Fair;

g)   Ensuring that those students ejected from the Fair were ejected at a location where they could be picked up by family or friends; or that they had transportation, or other means by which they could safely return to the parking or drop off area after being ejected; or that they were at least provided with an available, safe, marked and designated path they could use in the event they were forced to walk from the ejection point back to the parking area or pick-up location;

h)   Ensuring that at least one deputy or security employee was stationed outside the event at the location where students were being evicted, who could assist them in obtaining a ride or transportation home or back to their parking area or drop-off area; direct them how they could safely return to  their parking area or drop-off area in the event the students had to walk back from the ejection point – including escorting those students back through the Fair to be released at a Gate at which they had entered the Fair;

i)   Alternatively, providing a procedure whereby evicted, ejected and trespassed students could be initially released at a Gate in the vicinity where they had entered the Fair and where they were supposed to rendezvous with their transportation home;

j) Establishing a procedure for the immediate or contemporaneous notification of the parents or other responsible adults of any student or juvenile evicted, ejected or trespassed from the Fair and deposited outside the event by deputies or security personnel so that such parent or responsible adult would know that their child was no longer in the Student Day event Fairgrounds where the child was supposed to be, but had been taken outside the event proper by deputies or security where they would not be allowed to return.

25.     At all times material, HCSO knew or should have known that the failure to adequately staff the 2014 Student Day event, combined with the failure to specifically define for deputies and security personnel the type of conduct that would warrant or justify the stopping or detention or eviction of students would lead to the random and haphazard detention of juveniles without probable cause or legal justification and would likely result in the detention and ejection of students who had committed no crime or offense justifying their detention or ejection from the event.

26.     At all times material, HCSO knew or should have known that the failure to adequately implement the foregoing policies and procedures governing the release of students who had been trespassed or ejected from the Student Day event would constitute a situation in which juveniles were being taken into custody and transported to another location without the knowledge or consent of their parents or other responsible adults and that this would greatly enhance the likelihood that these juveniles being ejected would be left stranded in a location different from where they had been dropped off and different from where their parents expected them to be and that this constituted an unreasonable and unnecessary risk to the safety and welfare of these juveniles.

27.     At all times material, HCSO knew or should have known that students ejected from Gate 4 and not allowed to return into the Fair were being placed in physical proximity to the heavily

traveled through lanes of Interstate-4 and that, because of fencing and barriers both on and adjacent to the Fairgrounds, without assistance from deputies these juveniles would be unable to safely walk from outside Gate 4 back to the parking lots and entrance Gates on the other side of the Fairgrounds adjacent to US Hwy 301, where their parents or others had dropped them off and where they had come into the Fair.

28.     Notwithstanding HCSO's knowledge of the unsuitability of Gate 4 as an ejection or release point for juveniles being trespassed or evicted from the Student Day event for all the reasons mentioned, Gate 4 was the location chosen and used by HCSO to eject or evict or trespass students from the Student Day event.

29.     Notwithstanding HCSO's knowledge of the need for the establishment of specific policies and procedures as set forth herein to properly and safely service the security needs of the 2014 Student Day, on-duty deputies assigned to provide security at the Fair were given nothing more than a 15-20 minute briefing by HCSO supervisors at the nearby Amphitheater, during which deputies were simply given a map of the Fairgrounds and told to be alert for "unruly" behavior or 'misbehaving,' which defined by no specific or objective standards other than that it included such innocuous activities as running while in the Fair.

30.     Notwithstanding HCSO's knowledge of the need for specific uniform standards to be adopted governing the conduct that would warrant detention, trespass or ejection, Deputies attending the Amphitheater briefing were only told that they had the option, at their discretion, to eject or trespass students if he deputies felt it was warranted in his or her individual discretion, or that they could place the student under arrest.

31.     Notwithstanding HCSO's knowledge of the need for specific uniform standards to be adopted governing process by which juveniles who were being trespassed or otherwise evicted

should be dealt with and processed, deputies were merely instructed to detain those students by whatever means the deputy felt necessary and to then take those students to a temporary processing area that had been established by HCSO near the Amphitheater.  Some of the juveniles were apparently taken to the processing area via an HCSO transport van while others were apparently walked by the arresting or detaining deputy to the processing area. Once these student detainees had been transported to the processing area by whatever means, they were dropped off there and the deputies returned to the Fairgrounds.  No uniform procedure governing the transportation or processing of these juveniles was implemented.

32.     Notwithstanding HCSO's knowledge of the need to maintain contact and supervision of juveniles who were in even temporary custody or who were being processed for trespass or ejection, Deputies who escorted students to the temporary processing area were not instructed to stay with their detainees or supervise their processing, detention or release.  Deputies were instructed only to fill out the appropriate paperwork, after which they were free to leave the processing area and the student they had escorted there.

33.     No instructions, suggestions or advice was provided to any of the deputies at the Amphitheater briefing or at any other time mandating or even suggesting that there be any attempt to call, notify or otherwise contact the parents or any other responsible adult when student detainees were initially detained; when they were being taken or transported to the processing area; when they were taken or transported from the processing area to the ejection or release area or when these students were physically ejected from the Student Day event.

34.     On the night of February 7, 2014, the temporary processing area was understaffed and unable to efficiently process the student detainees brought there by deputies from the event.  At the processing area, there was great confusion as to who was in charge on behalf of the HCSO,

which students were being formally arrested and required transport off-site and which students were being trespassed or designated for ejection, and who was responsible for the various aspects of handling and processing the students who were being brought to the processing area and taking those to be ejected to the ejection point at Gate 4. Throughout the evening, deputies were dropping off students in their custody and control by merely filling out a form and leaving their detainee there at the processing area to be processed and dealt with by the inadequate number of staff on duty there. Upon information and belief, only three deputies were actually responsible for processing the numerous students that had been brought to the processing area and who were to be taken from there to Gate 4 for ejection. HCSO knew or should have known that far more staff was needed to safely monitor and process the large numbers of juveniles who were being detained, arrested, trespassed and/or ejected.

35. According to information and belief, the HCSO provided no supervisors to staff the temporary detention and processing area and the only HCSO supervisory personnel present at the processing area were those passing through on a temporary basis while dropping of detainees. The lack of supervisory personnel at the processing center added to the general confusion and disorganization that plagued the center on the night of February 7, 2014.

36. Although HCSO was, or should have been aware prior to February 7, 2014 that the Fair would be understaffed based on past experience as well as current information, security at the Fair on February 7, 2014 was understaffed, which contributed substantially to a general disorganization and chaos in terms of the processing and ejection of students who had been detained and would be ejected. Notwithstanding these conditions and the need for additional HCSO security personnel and especially supervisory personnel on February 7, 2014, HCSO did nothing to augment its staff at the Fair and took no action to adopt of implement any of the measures or procedures mentioned

herein, which would have helped to mitigate the lack of an adequate number of deputies and would have allowed for the orderly and safe processing and release of those students who were being detained and ultimately ejected or trespassed and would have allowed deputies the time and opportunity to contact parents or responsible adults to inform them that their child had been taken into custody and was being moved and ejected at a different location than that at which they had entered or at which they had been dropped off.

*Andrew*

37.     Like thousands of other Hillsborough County students, Andrew was in possession of a ticket to the 2014 Student Day issued by or on behalf of the School Board and he attended at the Fairgrounds with the knowledge and permission of his parents on February 7, 2014.

38.     During the early evening hours of February 7, 2014, at approximately 8:00 p.m., Andrew Joseph, III, was detained and placed in custody by HCSO deputies for alleged 'disorderly conduct' without cause or legal justification.  Andrew was held by force or threat of force and was denied the opportunity freedom of movement such that he was subjected to de facto arrest.

39.     At the time of his de facto arrest, Andrew was not disorderly, was in violation of no law, and was not smoking or drinking alcohol or using any other intoxicant.  Notwithstanding his lack of culpability, Andrew was targeted by unknown members of the HCSO, forcibly detained for disorderly conduct, and marked for ejection.

40.     At no time was any attempt made by deputies to contact Andrew's parents or notify them that their son had been taken into custody or that he was to be ejected from the Student Day event where he had been taken and dropped off with his parent's knowledge and permission.

41.     Although the exact sequence of events involving Andrew are unknown to Plaintiff at this time due to the failure of HCSO to produce any reports or records prepared by deputies regarding

their actions with regard to Andrew, he apparently was initially detained by a deputy or deputies within the Student Day event and designated for trespass and/or ejection from the Fair for reasons unknown at this time.  Witnesses have confirmed that Andrew was not committing any crime nor was he being disruptive or otherwise causing any disturbance or danger to himself or anyone else. He was apparently accosted by deputies who incorrectly assumed that Andrew had participated in some illegal or disruptive conduct because he had inadvertently been in the vicinity where such conduct by other juveniles – not Andrew - had been witnessed.   Andrew was then taken into custody and was then taken or transported by deputies to the processing area.  It is believed that during this process Andrew's cell phone was taken from him or that the screen had been broken such that information on the phone was unreadable and that it was not usable.  This made it even more important and imperative that HCSO have in place a policy by which they would contact the parents of children whom they had taken into custody and were preparing to transport to Gate 4 for release.  Because no such policy had been implemented by HCSO, Andrew's parents were completely unaware of the events concerning their son and were completely unaware that Andrew was being forcibly evicted from the Fair at a location a significant distance away from the location where his parents had authorized him to be dropped off and from which he was supposed to be picked up.

42.     Following his detention, de facto arrest, and visit to the processing area, Andrew was either driven or otherwise taken by deputies to Gate Four of the Fairgrounds and along with at least one other student, ejected there from the Student Day event in the area adjacent to Interstate-4.

43.     After being ejected outside Gate Four, Andrew's parents were not notified, he was given no assistance or opportunity to make a phone call, he was not provided or offered transportation

back to the Fair by HCSO, and was given no assistance or supervision whatsoever upon his release. Andrew was simply shown to the door and told to exit the facility.

44.     As previously set forth and as can be at least partially seen on Exhibit A, Gate 4, where Andrew was ejected, is in the area of the Fairgrounds property that is adjacent to the travel lanes of Interstate-4 and is separated and remote from the primary parking lots and entrance Gates at the opposite side of the Fairgrounds property adjacent to US Hwy 301 where Andrew had been dropped off and where he had entered the Fair that evening.  Due to fences and other barriers erected on and adjacent to the Fairgrounds property that night, there was no way to physically travel by foot back to the entrance area on the US Hwy 301 side of the Fairgrounds while remaining within the Fairgrounds property without going back in through Gate 4 and crossing back to the entrance area.

45.     Having been ejected outside Gate 4 and being unable to walk around the outside perimeter of the Fair to return to the entrance area on the US Hwy 301 side, Andrew and his companion were forced to wait in that area of the Fairgrounds property located between Gate 4 and Interstate-4. Vehicular access from outside the Fairgrounds to that portion of the Fairgrounds property where the boys were located was prohibited that night.

46.     Andrew, after being ejected through Gate 4, found himself on an area of the Fairgrounds from which he and his friend could not get back to their entrance around the outside perimeter of the Fair and where vehicles could not get in to where they were from outside the property.  As the boys were waiting there trying to decide what to do, a deputy in a patrol car drove up and told the boys that they could not stay where they were.

47.     Having no way to get back to the entrance where he needed to be in order to be picked up, Andrew and his companion walked back to Gate 4, explained their situation to the deputy and

asked the deputy stationed there if he would escort them back through the Fair to the US Hwy 301 side entrance Gates.  The deputy refused to do that and refused to allow the boys back into the event through Gate 4 so they could get back to the entrance.

48.     Andrew and his companion then asked the deputy at Gate 4 if he could provide or arrange for them a ride back to the entrance area on the US Hwy 301 side of the property.  The deputy refused.

49.     When then asked how they were supposed to get from outside Gate 4 where they had been ejected, back to the entrance area on the US Hwy 301 side of the property, the deputy instructed Andrew and his companion that the only way for them to get back to the entrance area on foot was to exit the gate on the far western side of the Fairgrounds at or very close to the place where I-4 and Orient Road intersect– which was the closest exit gate to Gate 4.  From that point, the deputy told Andrew and his companion that they had to exit the Fairgrounds, cross over I-4 to the west side of the Interstate (in the area of the Hard Rock Casino), and then walk in an easterly direction generally following the direction of I-4 until they reached US Hwy 301, at which point they could head south following 301 back to the entrance area of the Fairgrounds.  Understanding that this route given them by the deputy encompassed a walk of a substantial distance – estimated at 2-3 miles – the boys asked the deputy if he or any other deputy could give them a ride back to the entrance area instead of them having to walk by that circuitous route.  The deputy said that he and the other deputies could not give the boys a ride and instructed them to take the route he had outlined for them to get back to the entrance area.

50.     After receiving those instructions from the deputy at Gate 4 and having exhausted all other options for getting back to the entrance area near US Hwy 301, Andrew and his companion started out and exited the Fairgrounds along the route pointed out to them by the deputy.  During their

journey, Andrew crossed over I-4 to the west side of the travel lanes but attempted to return to the US Hwy 301 side of the Fairgrounds by crossing back over I-4 from the west side near the area of the Hard Rock Casino.  As Andrew tried crossing I-4 to get back to the Fairgrounds, he was struck and killed by a passing motorist.

51.     The toxicology report subsequently conducted by HCSO on Andrew showed that Andrew was completely free of any alcohol, drugs or intoxicants.

**COUNT I**

**(State Law Wrongful Death as to Defendant, HCSO/GEE)**

52.     At all times material, Deputies or employees of HCSO assigned to provide security at the 2014 Student Day events and were working within the course and scope of their employment as law enforcement officers for the use and benefit of the HCSO.

53.     At all times material, HCSO deputies detained and took Andrew, a minor, into their custody.  Upon so doing, deputies assumed an affirmative duty to take reasonable steps to notify Andrew's parents or responsible adult that Andrew had been taken into custody.

54.     Additionally, at all times material, HCSO deputies made an affirmative election to eject Andrew from the Student Day event and to transport or otherwise take him against his will to Gate 4, where he was ejected at a location said to be nearly a mile and a half away from the point at which he had entered the Fairgrounds and a substantial distance away from the point where he had been dropped off and had entered the Fair and where his parents expected and permitted him to be.

55.     HCSO deputies made a further affirmative elections to refuse Andrew and his companion to re-enter the Fair at Gate 4 for the purpose of returning to the entrance; to refuse them a ride back

to the entrance when they requested it; and to instruct and direct Andrew to take the route across I-4 to return back to the entrance area.

56.    Having assumed the aforementioned duties with regard to Andrew, in addition to the duty to notify Andrew's parents, HCSO deputies had a duty to take appropriate steps for the safety and well-being of Andrew and not to place Andrew in a position of risk greater than that which he would have faced without the deputies actions.

57.    At all times material, it was reasonably foreseeable that taking a minor into custody; transporting him to a different and more dangerous location for ejection; refusing him transportation and directing him to cross a heavily-traveled Interstate on foot; and failing to make any effort to notify his parents, could result in a situation in which the minor would be in danger that he would not otherwise have faced.

58.    On February 7, 2014, the deputies, agents, servants and employees of the HCSO were negligent with respect to their treatment of Andrew Joseph, III, as set forth herein.

59.    As the direct and proximate result of the negligence as set forth herein, Andrew was subjected to unnecessary danger and was killed, entitling his estate and survivors to recover damages as set forth in the Florida Wrongful Death Act.

WHEREFORE, Plaintiff demands damages from Defendant, HCSO, and trial by jury.

## COUNT  II

### (State Law Wrongful Death as to the School Board)

60.    At all times material, the Defendants, School Board elected to initiate, arrange, sponsor and conduct the Student Day affairs at the Fairgrounds on February 7, 2014.

61.     In connection with the Student Day event, upon information and belief, the School Board: advertised and promoted Student Day; made arrangements with the Fair Authority to initiate and conduct the event at the Fairgrounds; arranged for Hillsborough students to attend and to receive free admission; participated in designing and providing the activities that were offered and available at the event; had printed thousands of admission tickets for Hillsborough County students; had promotional materials designed and prepared; had admission tickets, promotional materials and announcements distributed to students during school hours, on school premises and by school employees; and assisted in making arrangements with the Fair Authority and the HCSO for the provision of security at the event.

62.     Having affirmatively undertaken these steps to coordinate Student Day and to associate itself with the Student Day event, the School Board had a duty to take such steps as were reasonably necessary to ensure that students attending the event would not be at risk of unnecessary danger by virtue of their attendance at Student Day.

63.     The duty of the School Board with regard to Student Day was not limited only to students of Hillsborough County public schools, but also extended to any other Hillsborough County students who could reasonably have been anticipated to have attended the event in light of the promotional efforts of the School Board, which were not expressly limited to public school students and in light of the fact that the free admission tickets that were distributed by the School Board were freely transferable to any student in Hillsborough County and were not restricted to public school attendees. As such, the School Board should reasonably have foreseen that all manner and types of Hillsborough County students would attend Student Day and that attendance would not be limited only to those students who attended Hillsborough County public schools.

64.     It was also reasonably foreseeable to the School Board that if HCSO security services included the ejection of students from the event, that the transporting of such students and their ejection at Gate 4, or other remote location, posed an unnecessary risk of harm to those students. Having arranged for security through HCSO, the School Board bears responsibility for the failure to ensure the safe treatment of all student attendees at Student Day, including those targeted for ejection or trespass, and including their safe release and ejection from the event.

65.     Based on the prior Student Day events held in previous years, the Defendants knew, or should have known, that security and safety of the students at the event were of paramount importance and that previous events had experienced serious difficulties in controlling the behavior of certain unruly students and had difficulty maintaining safety of the students.  As such, it was reasonably foreseeable to the Defendants that accidents or injuries to students could occur if proper and adequate safeguards were not adopted and put into place prior to February 7, 2014.

66.     At all times material, deputies of the HCSO and other providers of security at the Student Day event on February 7, 2014, were acting as the agents, servants, employees or representatives of the School Board and were acting on the School Board's behalf and for the benefit of the School Board, as the organizers and sponsors of the Student Day events.

67.     Defendants, by and through their employees, agents, servants or representatives, breached their duty and were negligent in ways that include, but are not necessarily limited to the following:

   a)   Failing to provide for adequate numbers of security and other supervisory personnel at the Fairgrounds, including HCSO personnel and School Board employees;

   b)   Failing to insist on proper procedures and guidelines to be implemented and utilized at the Fair for the identification of juveniles for ejection and the criteria for ejection from the Fair;

c) Failing to take measures to control the numbers of students in attendance at the Fair at any one time;

d) Failing to implement and utilize a system of parental notification upon the ejection of any student from the Fair;

e) Failing to provide for safe transportation of students to and from the Fair;

f) Failure to provide adult supervision; and

g) Failure to coordinate and work with the Fair and HCSO to ensure that proper procedures and adequate numbers of personnel were in place to safely monitor and deal with the numbers of students to whom the Defendants gave tickets and encouraged to attend the Fair.

68.    As the direct and proximate result of the negligence of these Defendants, Andrew Joseph, III was killed shortly after his being taken into custody and then released outside the Fair as set forth herein, thereby entitling his estate and survivors to recover damages as set forth in the Florida Wrongful Death Act.

WHEREFORE, Plaintiff demands damages from Defendant, School Board, and trial by jury.

## COUNT  III

### (State Law Wrongful Death as to the Fair Authority)

69.    At all times material, the Defendant, Fair Authority, was the owner and entity in control of the premises known as the Florida State Fairgrounds.

70.    This Defendant had a duty to take such reasonable steps as were necessary for the safety and protection of invitees onto the property, such as Andrew Joseph, III.

71.    Additionally, this Defendant, together with the School Board, took such affirmative steps to initiate, arrange, sponsor and conducted the Student Day affairs at the Fairgrounds on February

7, 2014.   As such, the HCSO deputies and other security personnel at the event  were acting as the agents, servants, employees or representatives of the Fair and were acting on the Fair's behalf and for the benefit of the Fair, as the property owner of the Fairgrounds and as an organizer and sponsor of the Student Day events.

72.     Based on the prior Student Day events held in previous years, the Defendant knew, or should have known, that security and safety of the students at the event were of paramount importance and that previous events had experienced serious difficulties in controlling the behavior of certain unruly students and had difficulty maintaining safety of the students.  As such, it was reasonably foreseeable to this Defendant that accidents or injuries to students could occur if proper and adequate safeguards were not adopted and put into place prior to February 7, 2014.

73.     Defendant, the Fair Authority, by and through their employees, agents, servants or representatives, breached their duty and were negligent in ways that include, but are not necessarily limited to the following:

   a)  Failing to provide for adequate numbers of security personnel at the Fairgrounds, including HCSO personnel;

   b)  Failing to insist on proper procedures and guidelines to be implemented and utilized at the Fair for the identification of juveniles for ejection and the criteria for ejection from the Fair;

   c)  Failing to take measures to control the numbers of students in attendance at the Fair at any one time;

   d)  Failing to provide for aisle ways and a midway of adequate width to prevent crowding and to deter unruly behavior;

e) Failure to have security or surveillance systems in place that would have assisted security personnel in identifying patrons who were acting in an unruly manner and should be ejected and, more importantly, to prevent innocent students such as Andrew, from being improperly and unfairly singled out or targeted for improper ejection;

f) Failing to implement and utilize a system of parental notification upon the ejection of any student from the Fair;

g) Failing to provide for safe transportation of students to and from the Fair;

h) Failure to provide adult supervision; and

i) Failure to coordinate and work with the HCSO and the School Board and School District to ensure that proper procedures and adequate numbers of personnel were in place to safely monitor and deal with the numbers of students to whom the Defendants gave tickets and encouraged to attend the Fair.

74. As the direct and proximate result of the negligence of these Defendants, Andrew Joseph, III was killed shortly after his being taken into custody and then released outside the Fair as set forth herein, thereby entitling his estate and survivors to recover damages as set forth in the Florida Wrongful Death Act.

WHEREFORE, Plaintiff demands damages from Defendant, the Fair Authority, and trial by jury.

**COUNT  IV**

**COUNT  VII**

**(Violation of 42 U.S.C. § 1983 Custom, Practice & Policy )**

**(Defendant Gee/HCSO)**

75.     At all times material hereto, Defendant Gee, as the Sheriff of Hillsborough County, was responsible for the safety, and security of the children taken into custody by the HCSO at the Student Day event at the Fair on February 7, 2014.

76.     Additionally, at all times material, HCSO knew based on extensive experience providing security and law enforcement services at past Student Day events in previous years, that the 2014 event would be attended by large numbers of students – children, and that proper staffing would be required and, perhaps more importantly, that specific policies and procedures were necessary to govern the taking of children into custody by deputies providing security and that specific policies, procedures and safeguards were necessary governing the transport, release and ejection of children who had been taken into custody for the purposes of arrest, temporary detention, trespass or eviction.  HCSO knew or should have known that policies and procedures needed to be implemented to ensure that parents were contacted if their child was taken into custody, transported, or ejected at a location different that that at which the child had been dropped off or entered the Fair.

77.     Additionally, HCSO knew or should have known, that the staff and procedures in place at the Fair were inadequate for the processing of the large numbers of students coming within the custody and control of deputies and that without adequate policies and procedures, significant numbers of children would be simply ejecting students from the Fairgrounds by transporting them to an outside location and forcing them out to make their way home as best they could.  HCSO should have known that a parental notification policy and procedure was essential for the safety and protection of these children.

78.     The history of security efforts at Student Day and the obvious need to implement appropriate policies and procedures to address the likelihood and foreseeability of danger to

children constitutes a deliberate indifference to the safety of the children in the custody of HCSO deputies and security personnel and a deliberate indifference to their constitutional rights. Alternatively, the dangers in this situation were so obvious and the potential victims being particularly vulnerable as to support an inference that HCSO knew that its deputies were likely to act in such a manner as to create an unreasonable risk of harm to those children taken into custody unless such precautionary policies and procedures were implemented for the 2014 Student Day events.

79.     As the direct and proximate result of the failure of HCSO to develop, implement and administer such policies and procedures as set forth herein, Andrew Joseph, III, a 14-year old private school honor student with no criminal background whatsoever, was improperly detained, taken into custody and transported off the Fairgrounds property to a location in the immediate vicinity of Interstate 4; was unnecessarily put at risk by deputies and was killed as a result.

80.     The death of Andrew Joseph, III would not have occurred but for the failures of the HCSO in failing or refusing to implement those practices and policies that were obviously necessary for the protection and safety of children such as Andrew.

81.     As the result of the death of Andrew Joseph, III, his estate and survivors have suffered damages for which they are entitled to recovery pursuant to the provisions of 42 U.S.C. § 1983.

WHEREFORE, Plaintiff demands recovery from HCSO for damages, costs, attorney's fees and any further relief that the Court may deem appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues herein.


Respectfully submitted this 22nd day of April, 2016.



Respectfully submitted,



*//s/  Barry A. Cohen*
BARRY A. COHEN, ESQ.
Florida Bar No.  0096478
MICHAEL W. GAINES, ESQ.
Florida Bar No.  775614
KEVIN J. DARKEN, ESQ.
Florida Bar No. 0090956
**BARRY A. COHEN, P.A.**
201 E. Kennedy Boulevard, Suite 1950
Tampa, Florida 33602
Work: (813) 225-1655; Fax: (813) 225-1921
bcohen@tampalawfirm.com
mgaines@tampalawfirm.com
kdarken@tampalawfirm.com
mwalsh@tampalawfirm.com
jhalle@tampalawfirm.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 22nd day of April, 2016, I electronically filed a true

and correct copy of the foregoing: *Amended Complaint* with the Clerk of the Court by using the

CM/ECF system which will send a notice of electronic filing to all parties of record.


*/s/  Barry A. Cohen*
BARRY A. COHEN, ESQ.