UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CASE NO.: 8:16-CV-00274-MSS-TBM

ANDREW JOSEPH, JR., as natural father,
next friend and personal representative of
the Estate of Andrew Joseph, III, deceased,

Plaintiff,

v.

CHAD CHRONISTER, in his official
capacity as the Sheriff of Hillsborough
County, State of Florida; THE FLORIDA
STATE FAIR AUTHORITY, an
instrumentality of the State of Florida;
Deputy Sheriff HENRY ECHENIQUE, in
his individual capacity; Deputy Sheriff
MARK CLARK, in his individual
capacity; Deputy Sheriff STEPHEN
JONES, in his individual Capacity,

Defendants.

_____

## THIRD AMENDED COMPLAINT

Plaintiff, ANDREW JOSPEH, JR., as the natural father, and Personal Representative of

the Estate of Andrew Joseph, III, by and through the undersigned counsel, hereby files this cause

of action against Defendants, CHAD CHRONISTER, in his official capacity as the Sheriff of

Hillsborough County, State of Florida; THE FLORIDA STATE FAIR AUTHORITY, an

instrumentality of the State of Florida; Deputy Sheriff HENRY ECHENIQUE, in his individual

capacity; Deputy Sheriff MARK CLARK, in his individual capacity; and Deputy Sheriff

STEPHEN JONES, in his individual capacity, and alleges as follows:

## JURISDICTION AND VENUE

1.     This is an action for damages in excess of $75,000 and for costs and attorneys' fees arising under section 1983 of Title 42 of the United States Code based upon violations and deprivations of rights arising under the Fourth and Fourteenth Amendments of the United States Constitution, together with claims brought under the laws of the State of Florida, for the targeting and unjustified detention and de facto arrest of a nonviolent and non-resistant juvenile, and the subsequent forced ejection from the event known as "Student Day" taking place at the Florida State Fairgrounds.  Said juvenile was targeted and illegally detained; subject to a de facto arrest; and then forcibly taken to a different area of the Fairgrounds than that which he had been dropped off, and a different area from where he was expected to be picked up, in furtherance of his ejection from Student Day at the Fair.  All of these actions took place without notification to the juvenile's parents and without any oversight or attention to his welfare and well-being after being ejected from the fairgrounds outside of Gate 4, in a remote area in close proximity to an area of heavy interstate traffic.  After being denied access to further transport or to walk through the Fair to return safely to his designated pickup location and being unfamiliar with the area outside of the fairgrounds, the juvenile crossed I-4 in an effort to return to the area where he was to be picked up from the Fair outside Gate 1.  After arriving on the other side of I-4 and realizing he was no closer to Gate 1, he attempted to cross back over I-4 to retrace his route back towards the Fair.  As he crossed back over I-4, the juvenile was hit and killed by a vehicle.  Plaintiff alleges the actions of the Defendants and the conduct related to these events constitutes conduct that shocks the conscience and is offensive to the community's sense of decency and fair play.  These events occurred on or about February 7, 2014, in Hillsborough County, Florida.

2.      These civil rights causes of action are brought pursuant to 42 U.S.C. § 1983, for violations of the Fourth and Fourteenth Amendments to the United States Constitution, which protect citizens from unlawful seizures and from the use of excessive or unreasonable force by law enforcement, cruel and unusual punishment, and loss of life or liberty without due process of law, respectively.  This Court has jurisdiction to hear § 1983 cases and has ancillary jurisdiction to hear pendant state Wrongful Death Act claims under Florida Statutes 768.16 – 768.28, as the claims arise from a common nucleus of operative fact.

3.      Venue is proper in this Court as at all times the actions, policies, customs, practices, and conduct herein alleged were performed and implemented in Hillsborough County, Florida, by the Defendants and their employees under the course and scope of their employment and under color of state and local law.

4.      All conditions precedent, including those set forth in §768.28(6)(a), Fla. Stat. (2007), have been performed or satisfied, have occurred, have been waived or would be futile.

5.      Jury trial is hereby demanded as to all Counts and issues so triable.

## PARTIES AND INTERSTED PERSONS

6.      Andrew Joseph, III. (hereinafter "Andrew") deceased, was at all times material hereto, a 14-year old eighth grade student attending a private school in Hillsborough County, Florida.  Andrew was an honor student with no criminal record; he bore no tattoos and was not associated with any gang or other criminally associated group and was in all respects a model citizen and student.  Andrew was killed on February 7, 2014, after having been a patron at the Florida State Fairgrounds on "Student Day".  At all times, Andrew was a citizen of the United States of America entitled to any and all rights, privileges, protections and immunities secured by the Constitution and the laws of the United States and the State of Florida.

7.      Plaintiff, ANDREW JOSEPH, JR., (hereinafter "Mr. Joseph") is the natural father of Andrew and is Personal Representative of Andrew's Estate.   Mr. Joseph is a resident of Hillsborough County, Florida, a citizen of the United States of America and entitled to any and all rights, privileges, protections and immunities secured by the Constitution of the United States and the laws of the State of Florida.

8.      Defendant, CHAD CHRONISTER (hereinafter "Chronister"), is and was at all times material hereto the Sheriff of Hillsborough County, serving in his official capacity as such, and acting under the color of state law.   Chronister is the director of and presides over the Hillsborough County Sheriff's Office (hereinafter "HCSO").   HCSO is the law enforcement agency for Hillsborough County.   Chronister and HCSO are used interchangeably in this complaint for Chronister.   At all times material, Chronister, acting in his official capacity as Sheriff of Hillsborough County, is a "person" for purposes of 42 U.S.C. § 1983.

9.      Defendant, THE FLORIDA STATE FAIR AUTHORITY (hereinafter "Fair") was at all times relevant to this Complaint, an instrumentality of the State of Florida organized and operating under the Florida Department of Agriculture.   The Fair is specifically authorized to sue and be sued in its own capacity by virtue of Florida Statutes §616.254.   Further, Florida Statutes §616.255(2) provides that the Fair shall ". . . promote the progress of the state and stimulate public interest in the advantages and development of the state by providing facilities for agricultural and industrial exhibitions, public gatherings, cultural activities, and other functions intended to advance the educational, physical, economic and cultural interests of the public. . . "

10.     The Fair is the owner of approximately 355 acres in Hillsborough County (hereinafter "the fairgrounds").   This area is located in between US Highway 301 to the east, Martin Luther King Drive to the south, Orient Drive to the west and I-4 to the north. The east side

of the fairgrounds, the US 301 side, provides the majority of vehicle access and primary public parking areas for the fairgrounds.

11.     Deputy Sheriff Henry Echenique (hereinafter "Echenique") at all times material to this action, was employed by the HCSO as a deputy sheriff.  He is sued in his individual capacity.

12.     Deputy Sheriff Mark Clark (hereinafter "Clark") at all times material to this action, was employed by the HCSO as a deputy sheriff.  He is sued in his individual capacity.

13.     Deputy Sheriff Stephen Jones (hereinafter "Jones") at all times material to this action, was a sworn deputy sheriff of the HCSO and was working an off-duty detail as an employee of the Fair.  He is being sued in his individual capacity.

14.     Pursuant to the Florida Wrongful Death Act, the survivors of Andrew are his natural father, Andrew Joseph, Jr., and Andrew's natural mother, Deanna Hardy, each of whom claim individually as survivors through Mr. Joseph as the Personal Representative of Andrew's Estate.

### UNDERLYING FACTS

15.     For over 50 years during Fair season, students of Hillsborough County schools have been given a day off from school and provided a free admission ticket to attend the Fair for what has come to be known as "Student Day".

16.     In 2014, there were over 100,000 free admission tickets handed out for Student Day, which occurred at the Fair on February 7, 2014.

17.     Upon information and believe, each year of the Fair, Student Day creates large attendance, especially amongst juveniles.

18.     HCSO had provided security for the Fair and for Student Day for many years prior to 2014.

19.     In 2014, security at the Fair, including for Student Day, was again provided by HCSO and included both on-duty and off-duty Deputies.

20.     An employment and indemnification agreement entered into between the Fair and HCSO provided that off-duty Deputies were to be considered employees of the Fair while they worked in an off-duty capacity and were compensated by the Fair.  A copy of the employment and indemnification agreement is attached hereto as Exhibit "A".

21.     Both HCSO and the Fair were aware of the history of Student Day and the specific safety issues created by the large number of juvenile students in attendance.

22.     Both HCSO and the Fair were aware that due to the large number of juveniles expected to attend Student Day, specific definitions and standards of conduct needed to be established so that deputies, whether on-duty or off-duty, would know what conduct was prohibited; what conduct was permissible; what objective standards would be used to determine who would be subject to detention; who would be subject to ejection; who would be subject to trespass; who would be subject to arrest; and the necessity for a system of supervisory oversight in place to balance a deputy's discretionary actions at Student Day to prevent excessive arrests, detentions, ejectments and trespass and to prevent the unconstitutional application of the discretionary actions of the deputies providing security at Student Day.

23.     Both HCSO and the Fair were also aware and on notice of the large number of juveniles expected to attend and due to past experiences in previous years' Student Day events, was aware and on notice that specific uniform procedures needed to be established for the 2014 Student Day for deputies to employ in the process of conducting arrests, detentions, ejectments and trespasses of juveniles and to prevent the unconstitutional application of those actions by deputies at Student Day.  Specifically, procedures needed to be established with respect to the

processing of juveniles into a system: where they would be taken; who would be responsible for them; what would take place at the Fair while juveniles were in custody and control of deputies prior to their transport off Fairgrounds; what reports or paperwork would be generated regarding each juvenile; and what supervision would be in place to ensure that the processing of these juveniles was properly and uniformly handled by deputies.

24.     Both HCSO and the Fair were further aware and on notice of the large number of juveniles expected to attend and due to past experiences in previous years' Student Day events, was aware and on notice that specific uniform policies and procedures needed to be established for the 2014 Student Day for deputies to employ in releasing juveniles following detentions, ejectments and trespasses from the Fair.

25.     At all times material, both HCSO and the Fair knew or should have known, that specifically for those juveniles who were being forcibly ejected from the Fair, but who were not being formally arrested, HCSO needed to have in place definitive, uniform procedures governing the following:

a.     What specific conduct would constitute "unruly" behavior or "misbehaving" that would warrant the stop or detention of students during the Student Day at the Fair;

b.     What specific conduct warranted the ejectment or trespassing of juveniles inside the Fair;

c.     Where these juveniles would be initially taken and processed for ejectment or trespass inside the Fair;

d.     A uniform location or release point where these juveniles would be taken to be ejected off the Fairgrounds away from Student Day events;

e.      A uniform procedure governing how and by whom these juveniles would be transported or taken from the processing area inside the Fair to the release or ejection location outside the Fair;

f.      Ensuring that the release or ejection location for these juveniles was safe and secure and that these juveniles be given proper instruction or supervision once ejected but prior to getting into the care and custody of their parents or guardians;

g.      Ensuring that those students ejected from the Fair were released at a location where they could be picked up by family or friends; or that they had transportation, or other means by which they could safely return to the areas where they could be picked up by family or friends; or that they had available a safe, marked and designated path that they could use to walk from the ejection location to the primary parking and drop off areas of the Fair;

h.      Ensuring that at least one deputy or Fair employee was stationed outside to assist those juveniles who were ejected by answering questions and directing them to transportation or to a safe, marked and designated path that could be used to walk from the ejection location to other areas, including the primary drop off/ pick up and parking areas of the Fair;

i.      Alternatively, HCSO and the Fair could have had a procedure in place whereby those students who were ejected were released from the Fair at a location near where they were to meet up with family or friends to be picked up following Student Day;

j.      Establishment of a procedure for the immediate and contemporaneous notification of the parents or responsible adults for any student or juvenile ejected or trespassed from the Fair and released outside the Fair by deputies so that the parents or responsible adults would know that their child was no longer at Student Day but had in fact been ejected from Student Day and was no longer allowed on Fairgrounds.

26.     At all times material, both HCSO and the Fair knew or should have known that the failure to adequately staff the 2014 Student Day, combined with the failure to have a system in place to deal with the misbehavior of students that  did not rise to the level of criminal behavior and to specifically define for deputies the type of conduct that would warrant detention or ejection of students, would lead to random and haphazard detentions and ejections without legal justification or probable cause and would also lead to false arrests.

27.     At all times material, both HCSO and the Fair knew or should have known that the failure to adequately implement policies and procedures governing the release of students who had been trespassed or ejected from Student Day would lead to a situation in which students were being taken into custody and transported to a location outside the Fair, without the knowledge or consent of their parents or other responsible adults, greatly increasing the level of confusion in the transportation of these students to and from the Fair and creating an unreasonable and unnecessary risk to the welfare and safety of these students who were otherwise left stranded in an unknown area outside the Fair.

28.     At all times material, both HCSO and the Fair knew or should have known that most students who attended the 2014 Student Day did not drive themselves to the Fairgrounds and many were dropped off by parents or other responsible adults.

29.     At all times material, both HCSO and the Fair knew or should have known that students ejected outside Gate 4 (adjacent to Orient Road and Interstate I-4) were being placed in an area that for many was on the complete opposite side of the Fairgrounds from where they were dropped off, entered the Fair, and had to be picked up, and due to not being allowed access to walk through the Fair, these students were left to figure out on their own how to get back to the other side of the Fair.

30.     Notwithstanding both HCSO and the Fair's knowledge of the unsuitability of the area adjacent to I-4 as the release point for those students who were ejected from the Fair, both HCSO and the Fair in fact chose this unsuitable location for the release of students who were ejected.

31.     Notwithstanding both HCSO and the Fair's knowledge of the need to have specific policies and procedures in place to handle the release of students who were ejected, to ensure a safe and orderly release to parents or adults who were responsible for picking up the students they dropped off from the Fair, HCSO had no uniform policies or procedures in place to address the release of ejected students.

32.     Notwithstanding both HCSO and the Fair's knowledge of the unsuitability of the area adjacent to I-4 for release of ejected students, and the lack of a uniform procedure to process the release of ejected students in a reasonably safe and orderly manner, neither HCSO or the Fair notified or communicated with the parents of ejected students, and deputies provided no assistance to the ejected students who were outside of the Fair,  leaving those students to fend for themselves in finding their way back home or back to the area where they were to be picked up from the Fair.

33.     Notwithstanding both HCSO and the Fair's knowledge there needed to be an objective, clear and defined criteria of conduct in place for deputies to differentiate between students whose conduct amounted to nothing more than minor misbehaving at the fair and students whose conduct rose to the level which warranted ejection from the Fair, there was no criteria in place and students who fell into either category were treated differently based on which deputy happened to be processing them at that time.

34.     Although both HCSO and the Fair were aware, or should have been aware, prior to Student Day 2014, based on past experiences with Student Day and the Fair, that they were going

to be understaffed for the number of students and anticipated conduct of the students, both HCSO and the Fair was understaffed for Student Day 2014, which substantially contributed to the general disorganization and chaos described herein with the processing of students who were detained and later ejected.  Further, HCSO and the Fair did nothing to mitigate the understaffed situation on February 7, 2014, leading HCSO and the Fair to shut down the Fair earlier than planned that night.

35.     Like thousands of other students, Andrew attended Student Day on February 7, 2014, with the permission of his parents and was at the Fair with friends from his neighborhood.

36.     At approximately 8:00 p.m., Andrew was detained and taken into custody by Deputy CLARK for alleged "disorderly conduct".  Andrew was held by force or threat of force and was not free to leave the custody of law enforcement and was therefore subject to a *de facto* arrest.

37.     Andrew came into contact with CLARK because he returned a baseball cap to another juvenile who was in the custody of the other deputies, as the cap had fallen off the juvenile as he was being escorted through the midway area of the Fair.

38.     At the time of his *de facto* arrest, Andrew was not in violation of any law, was not disorderly, had not been smoking, drinking or under the influence of any drugs, he had not been involved in any physical or verbal altercations, had not violated any posted Fair Rules nor was he behaving in a manner that would justify his detention in any way.  Nonetheless, and despite no reasonable suspicion or probable cause for his detention, Andrew was targeted by Deputy CLARK, forcibly detained and escorted through the midway to a processing/detention area inside the Fair.

39.     Once at the processing/detention area, CLARK turned custody of Andrew over to Deputy ECHENIQUE, who despite having no reasonable suspicion or probable cause, continued

11

the unlawful detention, and then unreasonably searched Andrew, seized his property, photographed and marked for him ejection from the FAIR.

40.     At no point did Deputies CLARK or ECHENIQUE attempt to notify Andrew's parents to let them know he was in their custody or to advise them he was being ejected from the Fair.

41.      While in processing, Andrew was forced to remove his shirt to be checked for tattoos of gang affiliation; he was photographed, written up for ejection for "disorderly conduct" and told he was being kicked out for running through the Fair and knocking people over, which was false.  Andrew was escorted out of the processing area and placed in the back of an HCSO van where he was unable to see out of the windows.

42.     Once in the Van, Deputy JONES, who was working for the FAIR in an off-duty capacity, drove Andrew and the other ejected occupants away from the processing center and outside the Fair, to an open field several hundred yards beyond the barrier of Gate 4, near Orient Road and Interstate 4.

43.      At no point did JONES attempt to notify Andrew's parents to let them know Andrew was in his custody or to advise them Andrew was being ejected from the Fair.

44.     At no time did anyone with the FAIR or HCSO ever attempt to notify Andrew's parents to let them know their 14-year-old son was ejected from the Fair.

45.     Once the transport van made its way to the release area outside, adjacent to Orient Road and I-4, Andrew was taken out of the van and released without any instruction or direction by JONES.

46.     After the van left, Andrew and a 12-year old companion, who lived in his neighborhood and came to the Fair with Andrew, made their way back toward Gate 4, where they

were notified by an unknown HCSO deputy who was also a Fair employee, that they could not re-enter the Fair.  Andrew requested transportation, an escort or assistance back to the other side of the Fair, to Gate 1 where they needed to be picked up, and all requests were denied by the deputy. Andrew asked how to get back to the other side of the Fair and was told by the same unknown HCSO deputy to exit the Fairgrounds, and the deputy pointed to an area near the Orient Road and I-4 intersection, the same area where they had just been released by the Van, and to then walk around to the other side of the Fair.

47.     At this point it was approximately 9:00 p.m., dark and raining.  This being their first time at the Fair, Andrew and his companion did not know exactly where they were, and both relied upon the lights from the Fair, the minimal direction from the unknown HCSO deputy and trial and error to find a route back to Gate 1 on the other side of the Fairgrounds to meet up with their ride home.

48.     After being denied access to walk back through the Fair and being given no direction other than to walk out near the Orient Road and I-4 intersection, Andrew and his companion began to walk toward the Hard Rock Casino, with Andrew leading the way as the older child, believing it would take them to their designated pickup location.

49.     After walking to the Hard Rock Casino complex, Andrew and his companion found themselves across I-4 from the Fair, with no direct access route to Gate 1 at the Fairgrounds. Realizing they were farther from their intended destination than when they began their journey, they then attempted to cross I-4, to head back to the Orient Road exit of the Fair, to try another way to reach their designated pickup location.  As Andrew was attempting to cross back over I-4 he was struck and killed by a passing motorist on westbound I-4.

50.     The 12-year-old companion witnessed Andrew being struck, and in a state of shock, managed to make his way back to the Fairgrounds area, and by luck, ran into the group of kids with whom he and Andrew got a ride to the Fair.

## COUNT I – STATE WRONGFUL DEATH ACTION AGAINST HILLSBOROUGH COUNTY SHERIFF CHAD CHRONISTER

51.     Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 50, inclusive, as if fully set forth herein.

52.     At all times material, on-duty HCSO deputies who were assigned to work the Fair on Student Day 2014, including but not limited to Defendants CLARK and ECHENIQUE, were working within the course and scope of their employment as law enforcement officers for HCSO and Sheriff CHRONISTER.

53.     At all times material hereto, CHRONISTER was charged with the responsibility and duty of adopting and implementing rules and procedures for HCSO deputies to ensure the safety and supervision of the public and students in attendance at Student Day 2014, including Andrew.

54.     HCSO deputies breached these duties and were negligent with respect to the detaining, processing and release of Andrew on February 7, 2014 by:

a.     Failing to employ an adequate number of on-duty deputies to handle the known demands of the crowd on Student Day;

b.     Failing to institute a policy whereby on-duty HCSO deputies and off-duty deputies had clear and distinct responsibilities concerning the safety and security of those in attendance at the Fair;

c.     Failing to instruct the on-duty deputies on specific policies and procedures on how to process minor students who were detained and marked for ejection;

      d.     Failing to follow a uniform policy or set of procedures with the detention and *de facto* arrest of Andrew;

      e.     Ejecting Andrew from the Fair after he was detained but not arrested;

      f.     Releasing Andrew after his ejection in a remote area on the opposite side of the Fair from where he was dropped off without providing a reasonable walking path to return to his designated pickup location;

      g.     Denying Andrew access to re-enter the Fair for the sole purpose of walking to his designated pickup location or by denying transportation for Andrew to that location; and

      h.     Failing to notify Andrew's parents that he had been taken into custody;

      i.     Failing to notify Andrew's parents that he had been ejected from the Fair;

      j.     Failing to notify Andrew's parents that he had been released from their custody at a location outside the Fair.

      k.     Failing to have a plan in place to supervise or insure the safety of minors, like Andrew, who were ejected from the Fair, needing to be reconnected with their parents or other responsible adults for safe transport home.

55.     HCSO deputies made an affirmative election to detain Andrew, a 14-year old, and took him into their custody and control against his will and removed him from the location his parents had approved and expected him to be, the Fair, and upon doing so, HCSO deputies assumed an affirmative duty to take responsibility for Andrew's safety and security until such time that they could return Andrew to the location where they removed him, or turn him over to his parents or to another responsible adult.

56.     HCSO deputies made an affirmative election to eject Andrew from Student Day and to drive him outside of the Fair and release him in a location on the opposite side of where Andrew was dropped off and was expected to be picked up.

57.     HCSO deputies made an affirmative election to release Andrew at a location which was several hundred yards beyond Gate 4 adjacent to and in close proximity to Orient Road and I-4, an area that did not provide a reasonable walking path for Andrew to make his way back to his designated pickup location.

58.     When Andrew requested assistance to return to the other side of the Fair, HCSO deputies made affirmative elections not to allow Andrew to walk back through the Fair, not to provide an escort through the Fair, not to provide transportation to the other side of the Fair and not to provide detailed instructions for how to safely walk back to his designated pickup location.

59.     HCSO deputies negligently failed to return Andrew to the Fair and failed to turn Andrew over to his parents or any other responsible adult when they released him from their custody and supervision on the outskirts of the Fairgrounds property.

60.     HCSO deputies had a duty to take appropriate steps for the safety and security of Andrew and not to place Andrew in a position of greater risk than that which he would have faced without the deputies' actions.

61.     As a direct and proximate result of the negligence of the HCSO, Andrew was killed while trying to return to the other side of the Fairgrounds, entitling his estate and survivors to recover all damages allowable under the Florida Wrongful Death Act.

WHEREFORE, Plaintiff demands judgment against CHRONISTER/HCSO for all damages allowable under the Florida Wrongful Death Act as well as any other relief the Court deems appropriate. Trial by jury is hereby demanded.

## COUNT II – STATE WRONGFUL DEATH ACTION AGAINST
## THE FLORIDA STATE FAIR AUTHORITY - VICARIOUS LIABILTY

62.     Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 50, inclusive, as if fully set forth herein.

63.     The Fair is the owner of the Fairgrounds property and organizing body for the Florida State Fair and Student Day at the Fair.  As such, the Fair had a duty to take reasonable steps to allow for the safety and security of those in attendance at the Fair, including all students in attendance on Student Day, like Andrew.

64.     In July 2013, the FAIR and HCSO entered a contract titled "EMPLOYMENT OF OFF-DUTY DEPUTY SHERIFFS, INDEMNIFICATION AGREEMENT", a copy of this contract is attached hereto as Exhibit "A".

65.     Said contract was in effect during the 2014 Student Day at the Fair, on February 7, 2014.

66.      At all times material, under the terms of the contract, off-duty HCSO deputies working at the Fair, including but not limited to Defendant JONES, were employees of the Fair and therefore the Fair is vicariously liable for the actions and omissions of these off-duty deputies during the course and scope of their employment with the Fair.

67.      On Student Day 2014, off-duty HCSO deputies were working at the processing area inside the Fair where Andrew was forcibly taken by Defendant CLARK and processed by Defendant ECHENIQUE.

68.     While at the processing area, off-duty deputies kept Andrew in their custody and control and thereby assumed the responsibility and duty of Andrew's safety and security until Andrew could either be returned to the Fair or turned over to his parents or another responsible adult.

17

69.     The Fair, through its employee off-duty deputies, had a duty to act reasonably with the processing and release of Andrew, and the Fair failed to do so by committing one or more of the following acts or omissions:

a.     Failing to employ an adequate number of off-duty deputies to handle the known demands of the crowd on Student Day;

b.     Failing to institute a policy whereby on-duty HCSO deputies and off-duty deputies had clear and distinct responsibilities concerning the safety and security of those in attendance at the Fair;

c.     Failing to instruct the off-duty deputies on specific policies and procedures on how to process students who were detained and marked for ejection;

d.     Ejecting Andrew from the Fair after he was detained but not arrested;

e.     Releasing Andrew after his ejection in a remote area on the opposite side of the Fair from where he was dropped off without providing a reasonable walking path to return to his designated pickup location;

f.     Denying Andrew access to re-enter the Fair for the sole purpose of walking to his designated pickup location or by denying transportation for Andrew to that location; and;

g.     Failing to notify Andrew's parents that he was ejected from the Fair; and

h.     Failing to have a plan in place to supervise or insure the safety of minors, like Andrew, who were ejected from the Fair, and need to be reconnected with their parents or other responsible adults for safe transport home.

70.     The Fair, through off-duty employee deputies, had a duty to take appropriate steps for the safety and security of Andrew and not to place Andrew in a position of greater risk than that which he would have faced without the deputies' actions.

71.     The Fair breached these duties and were negligent with respect to the detention, processing and release of Andrew on February 7, 2014.

72.     As a direct and proximate result of the negligence of the Fair, Andrew was killed while trying to return to the other side of the Fairgrounds, entitling his estate and survivors to recover all damages allowable under the Florida Wrongful Death Act.

WHEREFORE, Plaintiff demands judgment against the Fair for all damages allowable under the Florida Wrongful Death Act as well as any other relief the Court deems appropriate. Trial by jury is hereby demanded.

## COUNT III – STATE WRONGFUL DEATH ACTION AGAINST THE FLORIDA STATE FAIR AUTHORITY – DIRECT LIABILTY

73.     Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 50, inclusive, as if fully set forth herein.

74.     The Fair is the owner of the Fairgrounds property and organizing body for the Florida State Fair and Student Day at the Fair.

75.     Additionally, the Fair took affirmative steps to initiate, arrange, sponsor and conduct the Student Day event at the Fairgrounds on and before February 7, 2014.

76.     Based on the Fair's knowledge and experience from the Student Day events of prior years, the Fair knew or should have known that in the past the Fair had experienced serious difficulties in controlling the behavior of certain unruly students and had experienced difficulty in maintaining the safety of students, primarily due to the large number of students in attendance on Student Day.

77.     Based on the Fair's knowledge from prior years, it was reasonably foreseeable to the Fair that there would be a large number of students ejected from Student Day 2014.

78.     Based on the Fair's knowledge from prior years, it was reasonably foreseeable to the Fair that accidents or injuries to students, including those students who were ejected, could occur if reasonable safeguards were not adopted and put into place on and prior to February 7, 2014.

79.     As such, the Fair had a duty to take reasonable steps to allow for the safety and security of those in attendance at the Fair on Student Day, like Andrew.

80.     Despite the foreseeability of obvious safety and security issues related to the Student Day event, the Fair breached the duties owed to those in attendance on Student Day 2014, including Andrew, and was negligent by committing one or more of the following acts or omissions:

a.   Failing to take measures to control the number of students in attendance at the Fair at any given time during Student Day;

b.   Failing to take measures to control the number of students in any one particular area of the Fair, for example areas of the midway, to prevent overcrowding and deter unruly behavior;

c.   Failing to provide an adequate number of security personnel at the Fairgrounds, including but not limited to HCSO personnel;

d.   Failing to institute proper procedures and guidelines to be implemented and utilized at the Fair by security personnel for criteria used to identify behavior that warrants ejection;

e.   Failing to institute proper procedures and guidelines to be implemented and utilized by security personnel in the processing of students who met the criteria for ejection but did not get formally arrested by HCSO.

f.   Failure to utilize a surveillance system to assist security personnel in their task of deterring and combating unruly behavior, and equally important, would allow security personnel,

Case 8:16-cv-00274-MSS-CPT   Document 143   Filed 03/30/18   Page 21 of 32 PageID 1299

including HCSO personnel, to determine which students were not misbehaving and did not warrant ejection, like Andrew;

       g.  Failing to institute a system of parental notification for minors who were ejected from the Fair;

       h.  Failure to institute a system or otherwise provide adult supervision to minors who had been ejected from the Fair, but were not released to the custody of their parents or another responsible adult;

       i.  Failure to designate and provide a safety zone outside the gates of the Fair, but on the property of the Fairgrounds, where minor students who were ejected from Student Day would be allowed to safely wait for their ride home;

       j.  Failure to coordinate with HCSO to ensure reasonably safe and uniform procedures were in place and would be followed to process all minor students who were in attendance at Student Day and later ejected, but not formally arrested by HCSO deputies.

       81.    As a direct and proximate result of the negligence of the Fair, Andrew was killed while trying to return to the other side of the Fairgrounds, entitling his estate and survivors to recover all damages allowable under the Florida Wrongful Death Act.

       WHEREFORE, Plaintiff demands judgment against the Fair for all damages allowable under the Florida Wrongful Death Act as well as any other relief the Court deems appropriate. Trial by jury is hereby demanded.

### COUNT IV – VIOLATION OF 42 U.S.C. § 1983 DEPRIVATION OF CIVIL RIGHTS AGAINST HILLSBOROUGH COUNTY SHERIFF CHAD CHRONISTER

       82.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 50, inclusive, as if fully set forth herein.

83. At all material times, CHRONISTER was responsible for HCSO, its agents and employees, including supervising, overseeing, training and establishing policies, customs and procedures to conform their conduct to the United States Constitution and Florida common law.

84. At all times material hereto, CHRONISTER was charged with the responsibility of adopting and implementing rules and procedures for the proper and efficient maintenance, supervision and control of the deputies of the HCSO who were working the Student Day 2014 at the Fair, including:

a. To create, adopt and implement rules, regulations, practices and procedures, to handle the large number of juveniles who would be in attendance at Student Day;

b. To assure there would be an adequate number of deputies for the safety and security of those in attendance at the Fair and to assure that there would be an adequate number of deputies to properly address safety and criminal issues that need investigation so as not to deprive individuals, like Andrew, of constitutional rights due to expediency;

c. To create, adopt and implement rules, regulations, practices and procedures, to handle the processing of students who were detained by deputies at Student Day, like Andrew, to ensure there would be no violation of the individual's constitutional rights against unlawful search and seizure;

d. To create, adopt and implement rules, regulations, practices and procedures, to handle the large number of juveniles detained, including specific policies that come with the care and custody of minors, like Andrew, who were detained by HCSO deputies but never formally arrested and ejected from the fair without notice to their parents.

85. CHRONISTER owed a legal duty to Andrew to exercise reasonable care in the implementation of policies and procedures for deputies to follow at Student Day 2014. Andrew

was in the foreseeable zone of risk that was reasonably foreseeable to CHRONISTER, who breached that duty and that breach caused Andrew's death.

86.     CHRONISTER, with deliberate indifference, failed to adequately train or otherwise supervise and direct HCSO and its deputy sheriffs concerning the rights of the citizens they encounter in their duties, specifically in this case minor students who were at Student Day 2014, such that it was a policy, practice and custom for deputy sheriffs, including CLARK and ECHENIQUE, to take extreme and reckless actions against the students they encountered, including Andrew.

87.     CHRONISTER was on notice, by the history of Student Day at the Fair, of the need to correct the policies and procedures related to detaining minor students and to assure there was an adequate number of deputies on duty to prevent the extreme and reckless actions of HCSO and its deputy sheriffs as to the minor students, like Andrew, they would encounter on Student Day 2014.  This need for more or different polices and the inadequacy of same has been so obvious, combined with CHRONISTER's conscious choice not to act, so as to result in the violation of constitutional rights, including, but not limited to, the deprivation of Andrew's civil rights.

88.     The aforementioned actions committed by CLARK and ECHENIQUE were proximately caused by the policies, customs and practices of CHRONISTER in failing to fulfill his duties as alleged in the previous paragraphs of this Complaint.

89.     The aforementioned policies, customs and practices of CHRONISTER and the actions of CLARK and ECHENIQUE were the cause of Andrew's death and the Plaintiff's damages.

90.     The gross negligence, recklessness and deliberate indifference of CHRONISTER identified above was a further underlying cause of the constitutional torts committed by CLARK

and ECHNIQUE and was the proximate cause of Andrew's death and the Plaintiff's damages noted above.

WHEREFORE, Plaintiff demands judgment against CHRONISTER for compensatory and punitive damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other relief which the Court determines is appropriate.

### COUNT V - VIOLATION OF 42 U.S.C. § 1983 DEPRIVATION OF CIVIL RIGHTS AGAINST ECHENIQUE

91.     Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 50, inclusive, as if fully set forth herein.

92.     The actions of ECHENIQUE occurred within the scope of his employment with HCSO and/or the Fair, having occurred within the authorized time and space limits of his duties and for a purpose to serve CHRONISTER.

93.     ECHENIQUE and CLARK, working together as on-duty deputies of the HCSO, detained, processed and made the decision to eject Andrew from the Fair without legal justification.

94.     ECHENIQUE knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that Andrew was not misbehaving, acting disorderly, or in any way violating the law, when he simply handed another fair attendee his hat, which had just fallen off the boy while he was being escorted through the Fair.

95.     The fact that Andrew knew the boy that lost his hat is not criminal nor is this justification for detention, ejection or arrest.

96.     At all times material hereto ECHENIQUE had a legal duty not to subject Andrew to unreasonable search and seizure and not to force Andrew to remove his shirt so deputies could search for gang affiliation tattoos.

97.     All of this was done without any formal charges or arrest of Andrew.

98.     ECHENIQUE knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that there was no reason to detain Andrew, no reason to hold Andrew in the processing area, and no reason to trespass or eject Andrew from the FAIR.

99.     ECHENIQUE knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that there was no reason to eject Andrew from the Fair.

100.    ECHENIQUE knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that when you detain and eject a 14-year old, like Andrew, you need to notify his parents or another adult responsible for Andrew prior to ejecting him from the Fair, where his parents had allowed him to go and where his parents were under that impression he would be safe.

101.    By failing to attempt to notify Andrew's parents that their child was in custody, ECHENIQUE violated clearly established Florida law, Florida Statues § 985.101(3).

102.    ECHENIQUE violated Andrew's civil rights on February 7, 2014, by illegally detaining him, conducting an unlawful search and seizure, subjecting Andrew to a *de facto* arrest and then ejecting him from the Fair without legal cause.

103.    All these foregoing violations were of a type and character as to which any reasonable deputy would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established in Florida, in the Federal Court of Appeals of the United States, 11th Circuit, under the case law of the U.S. Supreme Court and the Guidelines of the United States Department of Justice.

104.    The aforesaid acts of ECHENIQUE were performed knowingly, intentionally, and maliciously, and/or were performed in a reckless manner with callous and deliberate indifference

to the health, safety and civil rights of Andrew, by reason of which Plaintiff is entitled to an award of punitive damages.

105.    As a direct and proximate result of the unlawful conduct of ECHENIQUE as aforesaid, Andrew was deprived of his civil rights, ultimately leading to his death.

WHEREFORE, Plaintiff demands judgment against ECHENIQUE for compensatory and punitive damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other relief which the Court determines is appropriate.

## COUNT VI - VIOLATION OF 42 U.S.C. § 1983 DEPRIVATION OF CIVIL RIGHTS AGAINST CLARK

106.    Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 50, inclusive, as if fully set forth herein.

107.    The actions of CLARK occurred within the scope of his employment with HCSO and or the Fair, having occurred within the authorized time and space limits of his duties and for a purpose to serve CHRONISTER.

108.    Upon information and belief, ECHENIQUE and CLARK, working together as on-duty deputies of the HCSO, detained, processed and made the decision to eject Andrew from the Fair.

109.    CLARK knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that Andrew was not misbehaving, acting disorderly, or in any way violating the law, when he simply handed another fair attendee his hat, which had just fallen off the boy while he was being escorted through the Fair.

110.    The fact that Andrew knew the boy that lost his hat is not criminal nor is this justification for detention, ejection or arrest.

111. At all times material hereto, CLARK had a legal duty not to subject Andrew to unreasonable search and seizure by forcibly removing Andrew from the Fair and taking him to a processing center, at which Andrew's belongings were inventoried and he was forced to remove his shirt, so deputies could search for gang affiliation tattoos.

112. All of this was done without any formal charges or arrest of Andrew.

113. CLARK knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that there was no reason to detain Andrew, no reason to move Andrew to the processing area, no reason to trespass Andrew simply because Andrew handed a boy a hat and when questioned why he did so, honestly told CLARK that he knew the boy.

114. CLARK knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that there was no reason to eject Andrew from the Fair.

115. CLARK knew or should have known and every reasonable deputy sheriff in his position would have concluded that when you detain and eject a 14-year old, like Andrew, you need to notify his parents or another adult responsible for Andrew prior to ejecting him from the Fair, where his parents had allowed him to go and where his parents were under that impression he would be safe.

116. By failing to attempt to notify Andrew's parents that their child was in custody, CLARK violated clearly established Florida law, Florida Statues § 985.101(3).

117. CLARK violated Andrew's civil rights on February 7, 2014, by illegally detaining him, conducting an unlawful search and seizure, subjecting Andrew to a de-facto arrest and then ejecting him from the Fair without legal cause.

118. All these foregoing violations were of a type and character as to which any reasonable deputy would be aware, and further the law prohibiting such conduct as

unconstitutional is clearly established in Florida, in the Federal Court of Appeals of the United States, 11th Circuit, under the case law of the U.S. Supreme Court and the Guidelines of the United States Department of Justice.

119.     The aforesaid acts of CLARK were performed knowingly, intentionally, and maliciously, and/or were performed in a reckless manner with callous and deliberate indifference to the health, safety and civil rights of Andrew, by reason of which Plaintiff is entitled to an award of punitive damages.

120.     As a direct and proximate result of the unlawful conduct of CLARK as aforesaid, Andrew was deprived of his civil rights, ultimately leading to his death.

WHEREFORE, Plaintiff demands judgment against CLARK for compensatory and punitive damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other relief which the Court determines is appropriate.

### COUNT VII - VIOLATION OF 42 U.S.C. § 1983 DEPRIVATION OF CIVIL RIGHTS AGAINST JONES

121.     Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 50, inclusive, as if fully set forth herein.

122.     The actions of JONES occurred within the scope of his off-duty employment with the Fair, having occurred within the authorized time and space limits of his duties and for a purpose to serve HCSO and the Fair.

123.     At all times material, JONES was an employee of the Fair and was wearing his HCSO uniform and badge, identifying him as a deputy sheriff for the HCSO.

124.     JONES drove the HCSO van that transported Andrew to the area of his release, several hundred yards away from Gate 4, near the Orient Road and Interstate 4 intersection, and then left Andrew there without any supervision or instruction.

125.    JONES knew or should have known, and every reasonable deputy sheriff in his position would have concluded that Andrew, who was never formally placed under arrest, should not be forced into the back of an HCSO van and transported outside the Fair, in violation of his constitutional rights.

126.    JONES knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that had Andrew been placed under arrest, he would have been transported to the Juvenile Assessment Center (JAC), where his parents would have been notified he was being held there safely, awaiting their arrival to release him into their custody.

127.    JONES knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that Andrew, a 14-year-old boy, should not be released from HCSO custody and left to his own wits in an area that is secluded, without any supervision or instruction.

128.    JONES knew or should have known, and every reasonable deputy sheriff in his position would have concluded, that Andrew, a 14-year-old boy, should not be released from HCSO custody without first notifying his parents or an adult responsible for Andrew.

129.    By failing to attempt to notify Andrew's parents that their child was in custody, JONES violated clearly established Florida law, Florida Statues § 985.101(3).

130.    By failing to release Andrew from his custody to his parents or another responsible adult, JONES violated clearly established Florida law, Florida Statues § 985.11(2).

131.    JONES violated Andrew's civil rights on February 7, 2014, by forcibly removing Andrew from the Fair property, placing Andrew in an HCSO van, subjecting Andrew to a de-facto arrest and then ejecting him from the Fair without legal cause.

132.    All these foregoing violations were of a type and character as to which any reasonable person would be aware, and further, the law prohibiting such conduct as unconstitutional is clearly established in Florida, in the Federal Court of Appeals of the United States, 11th Circuit, under the case law of the U.S. Supreme Court and the Guidelines of the United States Department of Justice.

133.    The aforesaid acts of JONES were performed knowingly, intentionally, and maliciously, and/or were performed in a reckless manner with callous and deliberate indifference to the health, safety and civil rights of Andrew, by reason of which Plaintiff is entitled to an award of punitive damages.

134.    As a direct and proximate result of the unlawful conduct of JONES as aforesaid, Andrew was deprived of his civil rights, ultimately leading to his death.

WHEREFORE, Plaintiff demands judgment against JONES for compensatory and punitive damages, costs, reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and any other relief which the Court determines is appropriate.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL COUNTS.**

Dated:  March 30, 2018

s/ Guy Bennett Rubin, Esq.
Guy Bennett Rubin, Esq. (Florida Bar No.: 691305)
grubin@rubinandrubin.com
Todd Norbraten, Esq. (Florida Bar No.:056605)
tnorbraten@rubinandrubin.com
Rubin & Rubin
PO Box 395
Stuart, Florida 34995
Telephone: (772) 283-2004
Facsimile: (772) 283-2009
Attorneys for Plaintiff

**Certificate of Service**

I hereby certify that on March 30, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

/s  Guy Bennett Rubin
GUY BENNETT RUBIN, ESQ.

**SERVICE LIST**

*Andrew Joseph, Jr., as Personal Representative of the Estate of Andrew Joseph, III*
*vs.*
*Chad Chronister, in his official capacity as the Sheriff of Hillsborough County;*
*Deputy Sheriff HENRY ECHENIQUE, in his individual capacity; Deputy Sheriff MARK*
*CLARK, in his individual capacity; and Deputy Sheriff STEPHEN JONES, in his individual*
*Capacity and Florida State Fair Authority*
**CASE NO: 8:16-CV-00274-MSS-TBM**
**United States District Court, Middle District of Florida, Tampa Division**

**Counsel for Chad Chronister, in his official capacity as Sheriff of Hillsborough County, FL**

Thea G. Clark, Esq.
Jason Gerard Gordillo, Esq.
Hillsborough County Sheriff's Office
2008 E. 8th Ave.
PO Box 3371
Tampa, FL 33605
tclark@hcso.tampa.fl.us
jgordill@hcso.tampa.fl.us

**Counsel for Deputy Sheriff HENRY ECHENIQUE; Deputy Sheriff MARK CLARK; and Deputy Sheriff STEPHEN JONES**

Thea G. Clark, Esq.
Jason Gerard Gordillo, Esq.
*(See above for address)*

**Counsel for Florida State Fair Authority**

Sean Michael Conahan, Esq.
Kathryn Collier, Esq.
Fulmer LeRoy & Albee, PLLC
605 South Blvd.
Tampa, FL 33606
sconahan@fulmerleroy.com
kcollier@fulmerleroy.com
eservicetpa@fulmerleroy.com